## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Steve N.,

               Plaintiff,

v.

Kilolo Kijakazi,
*Acting Commissioner of Social Security*,

               Defendant.

Case No. 21-cv-2312 (DJF)

**ORDER**

Pursuant to 42 U.S.C. § 405(g), *pro se* Plaintiff Steve N. ("Plaintiff") seeks judicial review of a final decision ("Decision") by the Commissioner of Social Security ("Commissioner") that denied his application for disability insurance benefits ("DIB") for the period between October 31, 2018 and March 31, 2019 ("Decision"). This matter is presented for decision by the parties' cross motions for summary judgment.[1] For the reasons given below, the Court finds the substantial evidence on the record as a whole supports the Decision. The Court grants the Commissioner's motion for summary judgment (ECF No. 25), denies Plaintiff's motion for summary judgment (ECF No. 18), and affirms the Commissioner's Decision.

## BACKGROUND

### I.    Procedural History

Plaintiff applied for DIB on August 12, 2019, with an alleged disability onset date of

---

[1] The parties consented to have the undersigned United States Magistrate Judge conduct all proceedings in this case, including the entry of final judgment.

October 26, 2018.  (Soc. Sec. Admin. R. (hereinafter "R.") 11, 285-288.)[2]  Plaintiff identified depression, bipolar disorder, anxiety, panic attacks, learning disability, chronic fatigue, hyperhidrosis, chronic pain, and excessive sleep as disabling conditions.  (R. 307, 314-315.)  At the time of his application Plaintiff was 51 years old and had not worked since 2014.[3]  (R. 287, 291.)  Plaintiff's long-term work history was overall sporadic with multiple years reflecting no work-related income.  (R. 294-296.)

The Commissioner denied Plaintiff's application initially (R. 180) and on reconsideration. (R. 214).   At Plaintiff's request, an Administrative Law Judge ("ALJ") held a hearing on September 22, 2020 (R. 11, 61, 218), during which Plaintiff amended the alleged onset date of his disability to October 31, 2018 (R. 11, 69-71).[4]  Plaintiff's date of last insurance ("DLI") was March 31, 2019 (R. 11), such that the operative disability period for purposes of this action is October 31, 2018-March 31, 2019.

The ALJ issued a written decision on January 11, 2021, finding Plaintiff not disabled and denying DIB. (R. 8-23.) On August 17, 2021, the Social Security Administration Appeals Council denied Plaintiff's request to review the ALJ's decision.  (R. 1- 8.)  Plaintiff filed this action on October 15, 2021.  (ECF No. 1.)

In his Complaint, Plaintiff argues that neither the Commissioner nor the ALJ properly

---

[2]  The Social Security administrative record (R.) is filed at ECF No. 12.  For convenience and ease of use, the Court cites to the record's pagination rather than the Court's ECF and page numbers.

[3]  Plaintiff worked at HOM Furniture from 2007-2014.  (R. 291-292.)

[4]  October 31, 2018 is one day after a previous unfavorable ALJ decision.  (R. 11.)  This case centers on Plaintiff's fifth application for DIB.  (R. 294.)  The Commissioner denied all of Plaintiff's prior applications.  (*Id.*)  ALJs upheld the decisions in Plaintiff's third and fourth applications, dated April 28, 2016 and October 30, 2018, respectively.  (R. 109-127, 133-150, 303-304.)  Plaintiff did not appeal either decision in federal court.

considered his Chronic Fatigue Syndrome when denying his DIB.  (ECF No. 1 ¶ 5.)  In his brief in support of his motion, Plaintiff states that the Decision does not reflect that he suffers from Chronic Pain Syndrome.[5]  (ECF No. 19 at 1.)  Plaintiff contends the ALJ improperly discredited three doctors who allegedly found him unable to work and did not properly consider Plaintiff's journal, which documented several years of his symptoms.  (*Id*.)  The Court liberally construes Plaintiff's submissions as a challenge to the ALJ's residual functional capacity ("RFC") finding.[6]  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)  (*pro se* pleadings must be liberally construed); *Stone v. Harry*, 364 F.3d 912, 915 (8th Cir. 2004) ( a court should construe a *pro se* pleading in a way that permits the layperson's allegations to be considered within the proper legal framework).  The Commissioner argues that substantial evidence supports the ALJ's analysis and conclusion and asks the Court to affirm the Decision.  (*See generally* ECF No. 26.)

## II.    Medical Evidence

The Court summarizes the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in Plaintiff's Complaint and the parties' briefs.  Plaintiff's primary allegation in his Complaint is that the Commissioner and the ALJ failed to properly consider his Chronic Fatigue and Chronic Pain Syndromes.  Also significant to Plaintiff's claims are the medical opinions and journal he contends were overlooked.

---

[5]  The Court considers Plaintiff's Chronic Fatigue Syndrome and Chronic Pain Syndrome separately.  It is unclear whether Plaintiff references the two interchangeably.  (*Compare* R. 504 (Plaintiff's journal entry that he was diagnosed with Chronic Pain Syndrome by Dr. Peter Kent on September 18, 2019) *with* R. 1143 (Dr. Peter Kent's September 18, 2019 medical report diagnosing Plaintiff with Chronic Fatigue Syndrome)).

[6]  RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

A.      **Chronic Fatigue Syndrome**

Dr. Peter Kent diagnosed Plaintiff with Chronic Fatigue Syndrome in September 2019, almost 6 months after Plaintiff's March 11, 2019 DLI.  (R. 1143.)  Because the record reflects that Plaintiff complained of symptoms related to the diagnosis during the relevant time period (*see, e.g.*, R. 353, 367-70, 375, 386 (journal entries describing excessive sleep, fatigue, and headaches); R. 1042, 1046, 1050, 1054, 1058 (Progress Notes from Minnesota Mental Health Clinics describing ongoing struggles with excessive sleeping, fatigue, and headaches)), the Court considers Chronic Fatigue Syndrome as a potentially disabling condition for the purposes of this lawsuit.

After examining Plaintiff and reviewing Plaintiff's physical and mental health history, Dr. Kent concluded that Plaintiff's "symptom complex would fit with Chronic Fatigue Syndrome."[7] (R. 1144.)  He observed that Chronic Fatigue Syndrome is a difficult condition because there is no diagnostic test, no way to objectively quantify severity, and no proven treatment.  (R. 1114.)  Dr. Kent noted that: (1) Plaintiff described feeling increasingly exhausted over the past five years and felt unable to work; (2) Plaintiff's prior treatment attempts included a variety of  physical and mental health medications including gabapentin, meloxicam, medical cannabis, Celexa, and Wellbutrin; (3) Plaintiff previously underwent a formal sleep consult; (4) Plaintiff's electroencephalogram ("EEG"), head magnetic resonance imaging ("MRI"), and blood tests were all normal; (5) Plaintiff stated that he could walk a mile on most days but also reported feeling chronically exhausted and that he slept twelve hours a day; (6) Plaintiff was able to perform daily living activities; (7) Plaintiff did not have any swollen joints or neurological deficits; and

---

[7] Based on Plaintiff's prior testing, outside records and laboratory testing, Dr. Kent was "reassured that [Plaintiff] does not have an underlying autoimmune inflammatory rheumatic disease."  (R. 1143.)

(8) Plaintiff's overall pain level was relatively low.  (R. 1142-1143).  Finally, Dr. Kent noted that he did not treat Chronic Fatigue Syndrome, and that in light of Plaintiff's past treatment attempts, he did not offer Plaintiff additional recommendations other than to participate in a low-impact exercise program.  (R. 1144.)  Dr. Kent observed that Plaintiff's "biggest concern [was] that of social security disability," but noted that he did not perform functional capacity assessments. (R. 1144.)  Dr. Kent advised Plaintiff that additional objective data may help him obtain DIB and suggested neurocognitive testing.[8]  (R. 1144.)

### B.    Chronic Pain Syndrome

On January 4, 2019, Plaintiff visited the Twin Cities Pain Clinic for treatment related to a severe headache that was aggravated by housework, movement and standing.[9]  (R. 963.)  Plaintiff reported that he was bipolar and that his head pain triggered his depression.  (R. 963.)  He also reported that taking Motrin somewhat alleviated the pain.  (R. 963.)  Plaintiff's care provider diagnosed Plaintiff with Chronic Pain Syndrome and prescribed Naproxen.  (R. 966.)  Plaintiff returned to the Twin Cities Pain Clinic on January 30, 2019 for a follow-up and medication refill. (R. 968.)  Plaintiff reported that: (1) he had no notable change in his head pain since his last visit; (2) he was unsure whether the medication was working; (3) the worst part of his migraine pain was in the back of his head; and (4) he was open to trying an occipital nerve block to alleviate some of the pain.  (R. 968.)

The record is replete with medical evidence that Plaintiff has suffered from chronic head

---

[8]  The record does not reflect that Plaintiff participated in neurocognitive testing, and any testing would have taken place outside of the relevant time period.

[9]    According to Plaintiff's medical notes, the onset date of his head pain was February 22, 2017.  (R. 963.)

pain for a number of years.[10]   (*See, e.g.*, R. 821, 824, 827, 836, 842-844.)  The record does not reflect that Plaintiff experienced any other source of chronic pain.  (*See, e.g.*, 821, 824, 827, 829, 836, 844, 963, 968 (chronic pain reports limited to headaches).)

### C.   Contested Medical Opinions

Plaintiff cites the medical opinions of Dr. Fred A Lux, Dr. Michael Donndelinger, and Dr. Jessica Maryniuk, whom Plaintiff contends found him unable to work.  (*See* ECF No. 19 at 1.) The record does not reflect that any of these doctors provided a medical opinion during the period under review regarding Plaintiff's ability to work.  Dr. Donndelinger appears to have provided opinions in November 2015, June 2016, and August 2018 that Plaintiff was unable to work, but other ALJs previously considered and discounted these opinions.  (*See* R. 124-125, 148.) Similarly, Dr. Lux stated his belief in March 2017 that Plaintiff could not hold a gainful job, but the ALJ reviewing Plaintiff's application at that time found the opinion inconsistent with other evidence.  (R. 829, 148.)  There are progress notes from both Drs. Maryniuk and Donndelinger during the relevant time period, reflecting an ongoing struggle with depression, anxiety, excessive sleep, difficulty with social interactions, and increased stress related to social security benefits. (*See* R. 1247-1273).  But the Court cannot identify any medical opinion during the relevant period that Plaintiff was unable to work.  (*See* R. 1257-73.)

### D.   Other Medical Evidence

#### 1.   Mental Health

During the relevant time period, Plaintiff suffered from depression (R. 966); bipolar disorder (R. 1060-1061, 1064), and personality disorder not otherwise specified (R. 1060).

---

[10]   While Plaintiff's medical records largely predate the period under review, the Court considers them because they reference chronic pain also documented during the relevant time period.

Plaintiff's history of mental illness largely predates the relevant time period of review.  For instance, in 2005, 2015, and 2017, Plaintiff had inpatient psychiatric hospitalizations, some of which related to suicidal ideation.  (*See, e.g.*, R. 171, 852.)  During the relevant time period, although Plaintiff reported some recurrent suicidal ideation, he did not experience hospitalizations, crisis interventions, or treatments other than routine outpatient therapy and medication management.  (*See, e.g.*, R. 1014-1061 (Progress Notes from Minnesota Mental Health Clinics November 14, 2018-April 22, 2019 ("Progress Notes")).)  Moreover, while he experienced low self-esteem, Plaintiff's Progress Notes reflect that his memory, concentration, attention, insight, and judgment were generally intact, good, or normal.  (*See, e.g.*, R. 1016, 1020, 1024, 1028, 1032, 1036, 1040, 1048, 1052, 1056, 1060.)  Plaintiff's Progress Notes also reflect that Plaintiff regularly attended a drop-in center through his mental health clinic, maintained relationships with family, and had at least one friend with whom he kept in touch.  (*See, e.g.*, R. 1022, 1026, 1030.)

### 2.    Physical Health

Medical records that predate the period under review document that Plaintiff also suffered from episodic hypersomnia (R. 838) and mild upper airway resistance variant of sleep apnea (R. 838).  But in 2017, Plaintiff participated in a sleep study that did not reflect sleep apnea or pathologic hypersomnia.  (R. 837.)  Plaintiff's records also consistently reflect normal musculoskeletal functioning with full strength and a normal gait.  (*See, e.g.*, R. 822-823, 828-829, 831, 834-836, 840, 844-846, 965-966, 970-971 (medical records both within and outside the relevant timeframe showing a history of physical well-being).)

### 3.    Administrative Medical Findings

Dr. Hallie Richards assessed Plaintiff's physical RFC in connection with his initial application for DIB.  Dr. Richards determined that Plaintiff was capable of full-time work at a light

exertion level with some environmental restrictions, including avoidance of concentrated exposure to noise, bright lights, pulmonary irritants, and hazards due to migraines. (R. 175-76.)  She noted that Plaintiff's headaches responded well to medication and that his physical exams were neurologically normal.  (R. 176.)  She also noted Plaintiff's fatigue, but attributed it to his depression based on Plaintiff's own statements.  (R. 176.)  Dr. Stephen Richards agreed with this assessment at the reconsideration level.  (R. 195-196.)  Dr. Stephen Richards further noted that while Plaintiff alleged he was bed-ridden, Plaintiff could not establish this prior to his DLI. (R. 196.)

Dr. Mira Krishnan assessed Plaintiff's mental residual functional capacity at the initial level and determined that Plaintiff could "complete simple, routine, and repetitive work and make simple workplace decisions," but could not "work in an environment that is fast paced or that imposes significant production quotas," and can tolerate "only routine workplace changes." (R. 178.)  She noted that Plaintiff's mental health generally had been stable since 2017 with conservative to moderate treatment.  (R. 178.)  Dr. Ray Conroe agreed with this assessment at the reconsideration level.  (R. 196-198.)

### 4.    Michael Bortel, M.A., L.P.

In August 2016, Michael Bortel, M.A., L.P., opined that Plaintiff's "psychological and physical problems cause him constant difficulties" that "prevent him from working and having a reasonable life."  (R. 574-576.)  Drs. Krishnan, Conroe, Hallie Richards, and Stephen Richards all considered this opinion (R. 165-66, 187), but concluded Plaintiff was not disabled for the period under review.  (R. 180, 199-200.)

### 5.    Plaintiff's Journal

Plaintiff maintained a journal ("Journal") (R. 331-397) for over five years in which he

sporadically documented his symptoms.[11]  For example, on November 27, 2018, Plaintiff wrote, "I have been sleeping an average of 12 hours a day.  When I start sleeping less, I get really depressed, sick, suicidal thoughts, and just not able to function." (R. 367.)  On December 3, 2018, he wrote, "I have been very sick or in a lot of pain the last couple of months.  This weekend I actually had to take a nap as I have been so exhausted." (R. 368.)  On December 12, 2018, Plaintiff wrote, "I think it's going on 6 years and nothing has changed with my [h]ealth.  I am very depressed and suffer with pain in my head that can last for months at a time." (R. 369.)  Plaintiff's other entries similarly document his ongoing struggle with excessive sleep, headaches, and mental health.  (*See* R. 370, 375, 386.)

### III.    The Administrative Hearing

On September 22, 2020, the ALJ held a telephonic hearing at Plaintiff's request, during which Plaintiff, who was represented by an attorney, and a vocational expert ("VE") testified.  (R. 11, 61, 218.)  Plaintiff testified that intense head pain regularly caused him to sleep for more than half the day and that he often felt anxious and overwhelmed.  (R. 77-80, 83-84, 88-89.)  He stated that while he could sometimes drive and complete basic daily living activities, his pain and sleep requirements precluded his ability to maintain regular employment.  (R. 74-75, 85-86, 90-92.)  Plaintiff most recently worked in the warehouse at Hom Furniture but said he left the job over six years earlier when his pain and fatigue became too much to bear.  (R. 76-78.)  Plaintiff further testified that he had documented his symptoms in his Journal for over five years and that Dr. Kent "finally diagnosed" him with Chronic Pain Syndrome after reading the Journal.  (R. 80- 82; *see also* R. 331-397.)  Plaintiff said his pain was so severe he was not able to feel pleasure.  (R. 84.)

---

[11]  The Court reviewed the entire Journal but highlights entries only from the relevant time period.  Entries outside the relevant time period reflect an ongoing history of head pain and fatigue.

The VE testified that a hypothetical person with Plaintiff's age, education, and work experience who was limited to: (1) light work; (2) no concentrated exposure to dust, odors, fumes or pulmonary irritants; (3) a moderate noise level; (4) simple, routine, and repetitive tasks that are not performed at a fast production-rate pace; (5) occasional interactions with supervisors, coworkers, and the public; and (6) occasional changes in a predictable work setting could not perform Plaintiff's past work. The VE further testified, however, that so long as the hypothetical person was not off-task or required unscheduled breaks more than 10% of the time, and was absent no more than one day per month, they could work as a mailroom clerk, price marker, or clerical data entry clerk. (R. 98-100.)

## IV.     The ALJ's Written Decision

The ALJ issued a written decision on January 11, 2021, finding Plaintiff not disabled and denying DIB. (R. 8–23.) The ALJ noted that he left the record open for two weeks to allow Plaintiff to submit an additional medical opinion, but Plaintiff did not do so. (R. 11.)

Pursuant to the five-step sequential analysis outlined at 20 C.F.R. §§ 404.1520(a), and 416.920(a),[12] the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the amended onset date of his disability; (2) suffered from the following impairments that, at least in combination, were severe: chronic pain syndrome, chronic fatigue syndrome, episodic hypersomnia, chronic headaches, depression, bipolar disorder, and personality disorder (not otherwise specified); (3) did not have a listed impairment or a combination of impairments that

---

[12]   The five steps are (1) whether the claimant's work history includes substantial gainful activity; (2) the medical severity of the claimant's impairments; (3) whether one or more impairments meets or medically equals the criteria of a listed impairment, and meets the duration requirement; (4) the claimant's RFC and ability to perform past relevant work; and (5) the claimant's RFC and whether he can make an adjustment to other work.   20 C.F.R. § 416.920(a)(4)(i)–(v).

met or medically equaled a listed impairment as defined in 20 C.F.R. Part 404, Subpart P, Appendix I ("Listing of Impairments" or "Listing")[13]; (4) could not perform his past relevant work, but retained the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) except no concentrated exposure to dust, odors, fumes and pulmonary irritants; moderate noise level; simple, routine and repetitive tasks that are not performed at a fast production-rate pace, such as that found in assembly-line work; occasional interactions with supervisors, coworkers and the public; and able to tolerate occasional changes in a predictable work setting;

and (5) was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (R. 13-23.) Based on these findings the ALJ concluded Plaintiff was not disabled. (R. 23.)

To determine Plaintiff's RFC, the ALJ considered the entire record, including Plaintiff's reported symptoms and limitations, as well as medical opinion evidence and prior administrative medical findings. (R. 17-21.) The ALJ determined that while Plaintiff's medical determinable impairments reasonably could be expected to cause his alleged symptoms, Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (R. 18.)

With respect to Plaintiff's Chronic Fatigue Syndrome, the ALJ noted that Plaintiff's symptoms were limited to malaise, headaches, and waking up unrefreshed, and that he did not appear to suffer from other symptoms commonly associated with the disorder. (R. 18.) The ALJ also remarked that Plaintiff did not pursue additional neurocognitive testing to provide additional data about his symptoms. (R. 18.) But based on the evidence, the ALJ concluded there was no medical explanation for Plaintiff's symptoms apart from Chronic Fatigue Syndrome. (R. 19.) The

---

[13]   The Listing of Impairments is a catalog of presumptively disabling impairments categorized by the relevant "body system" impacted. *See* 20 C.F.R Part 404, Subpart P, App. 1.

ALJ remarked that: (1) he found Plaintiff's hypersomnia to be severe based on Plaintiff's self-reporting, despite objective testing that did not confirm Plaintiff had a sleep disorder; (2) Plaintiff's chronic pain complaints were not specific beyond head pain, which he used Motrin to control; (3) he considered Plaintiff's chronic headaches when imposing environmental restrictions related to noise and pulmonary irritants; (4) Plaintiff had limited treatment since seeing Dr. Kent in 2019; (5) Plaintiff's neurological and musculoskeletal functioning were intact, both within and outside the period of adjudication; and (6) Plaintiff had a sporadic long-term work history (R. 18-21, citing R. 294-296 (long-term work-history); 74-75, 85-86, 90-92 (Plaintiff's testimony during hearing); 837-838 (2017 sleep study); 823, 829, 831, 835-836, 846, 871, 965, 1349 (neurological and musculoskeletal functioning assessments); 1142-1144 (Dr. Peter Kent's Report); Social Security Administration Disability Insurance, Policy Interpretation Ruling-SSR 14-1p: Titles II and XVI: Evaluating    Cases    Involving    Chronic    Fatigue    Syndrome    (CFS), https://www.ssa.gov/OP_Home/rulings/di/01/SSR2014-01-di-01.html (last visited February 13, 2023) ("SS Ruling 14-p1").)

The ALJ further noted that he had considered Plaintiff's long-standing history of mental illness, including Plaintiff's depression, bipolar, and personality disorder diagnoses. (R. 20 (citing R. 539, 966, 1068).)   The ALJ observed that while Plaintiff reported some recurring suicidal ideation during the relevant timeframe, the record did not reflect hospitalizations, crisis interventions, or treatments/services other than routine, outpatient therapy and medication management.  (R. 20.)  The ALJ further observed that Plaintiff:  (1) regularly saw a therapist and received psychiatric care; (2) occasionally posed a risk to himself due to a history of suicidal ideation; (3) suffered from low self-esteem, but his memory, concentration, attention, insight, and judgment were typically intact, good or normal; (4) attended a drop-in center through his mental

health clinic; and (5) maintained relationships with family and at least one friend, but was not otherwise socially involved.  (R. 20, citing R. 867 (risk for self-harm); 980, 984, 988, 992, 996, 1000, 1004, 1008, 1012, 1016, 1020, 1024, 1028, 1032, 1036, 1040, 1044, 1048, 1052, 1056, 1060, 1064, 1068, 1072, 1076, 1080, 1084, 1088, 1092, 1096, 1100, 1104, 1108, 1112, 1116, 1120, 1124, 1128, 1132, 1136 (low self-esteem, but other positive findings); 1214, 1254, 1387, 1395 (social involvement).)

The ALJ observed that the record did not contain any opinions from treating or examining physicians that Plaintiff was physically disabled or had any physical limitation greater than those included in his RFC.  (R. 19.)  He did not defer or give any specific evidentiary weight to prior administrative medical findings, but he considered and largely agreed with Drs. Hallie and Stephen Richards and Drs. Krishnan and Conroe's determinations that Plaintiff was not disabled, and he adopted most of their conclusions in his RFC determination.  (R. 19-20, citing R. 175-176, 195-196 (physical RFC administrative medical findings); 176-178, 196-198 (mental RFC administrative medical findings).)  The ALJ similarly considered Michael Bortel's opinion but found it unpersuasive because it was conclusory and outside of the relevant time period, and because Mr. Bortel was not a medical doctor.  (R.  21.)

The ALJ also considered Plaintiff's description of his limited daily activities, but observed that even if Plaintiff's self-reports could be verified with any reasonable degree of certainty it would be difficult to attribute the degree of limitation Plaintiff described to Plaintiff's medical condition, in view of weak medical evidence.  (R. 21.)  The ALJ further observed that despite Plaintiff's described limitations during the relevant timeframe, "he was able to live alone in a townhome, independently attend to his personal care needs, go out in public alone, shop by computer, do some housework, prepare meals, get together with others to watch movies; maintain

familial relations and at least one friendship; frequent a 'drop-in center;' read; follow television programs; and manage his personal finances." (R. 21.) The ALJ found these activities were "fully consistent with, and likely in excess" of the restrictions in his RFC determination. (R. 21.) Finally, the ALJ opined that Plaintiff's spotty long-term work history undermined his allegations that he became medically disabled from full-time employment in October 2018. (R. 21, citing R. 294- 296.)

## DISCUSSION

### I.   Legal Standard

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or whether the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions." *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)). The Supreme Court has explained:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence ... is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). "[The] Court considers evidence that detracts from the Commissioner's decisions, as well as evidence that supports it." *Nash*, 907 F.3d at 1089 (quoting *Travis*, 477 F.3d at 1040). "If substantial evidence supports the Commissioner's conclusions, [the] Court does not reverse even if it would reach a different conclusion, or merely

because substantial evidence also supports the contrary outcome." *Id.* (quoting *Travis*, 477 F.3d at 1040). In other words, "if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings, [the Court] must affirm the decision." *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting *Cruz v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996)).

A claimant has the burden to prove disability. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). The claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The disability, not just the impairment, must have lasted or be expected to last for at least twelve months. *Barnhart, v. Walton*, 535 U.S. 212, 217-22 (2022); *see also Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993). Moreover, to establish that Plaintiff is entitled to disability insurance benefits, he must establish that he was disabled prior to the date of his last insurance, which in this case was March 31, 2019. *See* 20 C.F.R. § 404.130; *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009).

## II.     Analysis

The Court construes Plaintiff's submissions as a challenge to the ALJ's finding related to his RFC. Plaintiff contends the ALJ improperly discredited doctors who found him unable work, failed to consider that Plaintiff suffers from Chronic Pain and Chronic Fatigue Syndromes, and did not consider his Journal. (ECF Nos. 1 at 2; 19 at 1.) Plaintiff reiterates that he suffers from extreme fatigue and states that he also suffers from back pain. (ECF No. 19 at 1.) Plaintiff states:

> My case really saddens me being so sick and falling through the cracks. I was judged for 5-6 years when I didn't even have a diagnosis and the doctors didn't have a clue. Now I have a diagnosis and it's too late to have a fair trial.

(*Id.*)  The Court recognizes Plaintiff's frustration and understands that he feels the evidence supports a more restrictive RFC.  Nevertheless, having thoroughly reviewed the entire record, including Plaintiff's diagnoses and symptoms related to Chronic Fatigue and Chronic Pain Syndromes, and having read Plaintiff's Journal, the Court finds substantial evidence supports the ALJ's RFC determination and that Plaintiff has failed to meet his burden to show additional limitations were warranted.

RFC is defined as the most a claimant can do despite his limitations, including both physical and mental limitations.  20 C.F.R. § 404.1545(a).  It is the claimant's burden to prove his RFC.  *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003) (citing *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)); *accord Charles v. Barnhart*, 375 F.3d 777, 782 n.5 (8th Cir. 2004).  The ALJ bears primary responsibility for assessing a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and a claimant's own descriptions of the claimant's limitations.  *See*  20 C.F.R. § 404.1545(a)(3); *see also*, *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016); *Roberts v. Apfel*, 222 F.3d, 466, 469 (8th Cir. 2000).  "Because a claimant's RFC is a medical question, an ALJ's assessment must be supported by some medical evidence of the claimant's ability to function in the workplace."  *Hensley*, 829 F.3d at 932 (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)).  Moreover, the "ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional."  *Baldwin*, 349 F.3d at 556.  The ALJ must determine the claimant's RFC based on all of the relevant medical and non-medical evidence.  *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016); 20 C.F.R. § 404.1545(a)(3).  An ALJ's RFC determination is acceptable if it is supported by at least some medical evidence based on the ALJ's independent review of the record.  *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002).

Here, the ALJ determined that while Plaintiff could not perform his past relevant work, he retained the RFC to perform light work with a number of environmental, mental, and adaptation restrictions.  (R. 17-21.)  The Court finds substantial evidence supports both the ALJ's RFC determination and his overall conclusion that Plaintiff was not disabled during the relevant timeframe.  The ALJ thoroughly explained his analysis of the relevant evidence, including Plaintiff's subjective statements and testimony, the objective medical evidence, and the medical opinions and prior administrative medical findings.  (R. 13-23.)  He also consulted a vocational expert, who testified that a hypothetical person with Plaintiff's vocational profile and the limitations reflected in Plaintiff's RFC could not perform any of Plaintiff's past work but could perform other light, unskilled work existing in significant numbers in the national economy. (R. 21-23, *see also* R. 98-100 (VE's testimony that Plaintiff could perform representative occupations, including mailroom clerk, price marker, or clerical data entry clerk).)

The ALJ acknowledged Plaintiff suffered from medically determinable impairments— including Chronic Pain and Chronic Fatigue Syndromes (R. 14)—that could reasonably be expected to cause his alleged symptoms (R. 18), but explained that Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record when: (1) Plaintiff's symptoms related to Chronic Fatigue Syndrome were limited to malaise, headaches, and waking unrefreshed; (2) an objective sleep study did not show pathologic hypersomnia; (3) Plaintiff's chronic pain was limited to headaches, which Plaintiff relied on Motrin to control; (4) the record reflected limited formal treatment as to Plaintiff's Chronic Fatigue and Chronic Pain Syndromes; (5) Plaintiff's medical records showed a history of intact neurological and musculoskeletal functioning with full strength and normal gait; (6) Plaintiff's mental health treatment during the

relevant time period was limited to routine outpatient therapy and medication management; and (7) despite low self-esteem, Plaintiff's memory, concentration, attention, insight, and judgment were typically intact, good, or normal.  (R. 17-21, citing R. 837-838 (2017 sleep study); 823, 829, 831, 835-836, 846, 871, 965, 1349 (neurological and musculoskeletal functioning assessments); 980, 984, 988, 992, 996, 1000, 1004, 1008, 1012, 1016, 1020, 1024, 1028, 1032, 1036, 1040, 1044, 1048, 1052, 1056, 1060, 1064, 1068, 1072, 1076, 1080, 1084, 1088, 1092, 1096, 1100, 1104, 1108, 1112, 1116, 1120, 1124, 1128, 1132, 1136 (low self-esteem but other positive findings); SS Ruling 14-p1) (Chronic Fatigue Syndrome policy interpretation ruling).)

The ALJ also described his consideration of medical opinion evidence and prior administrative findings, including whether and how they persuaded him.  (R. 19-21.)  Under 20 C.F.R. § 404.1520(c), an ALJ evaluates the persuasiveness of medical opinions by considering: (1) whether they are supported by objective medical evidence; (2) whether they are consistent with other medical sources; (3) the relationship that the source has with the claimant; (4) the source's specialization; and (5) any other relevant factors. 20 C.F.R. § 404.1520c(c).   The first two factors—supportability and consistency—are the most important.  20 C.F.R. § 404.1520c(a).

The ALJ did not defer or give any specific evidentiary weight to prior administrative medical findings, but he considered and largely agreed with Drs. Hallie and Stephen Richards and Drs. Krishnan and Conroe's determinations that Plaintiff was not disabled, and he adopted most of their conclusions in his RFC determination.  (R. 19-20, citing R. 175-176, 195-196 (physical RFC administrative medical findings); 176-178, 196-198 (mental RFC administrative medical findings).)  The ALJ similarly considered Michael Bortel's opinion, but found it unpersuasive because it was conclusory and outside of the relevant time period, and because Mr. Bortel was not a medical doctor.  (R.  21.)

Plaintiff contends the ALJ wrongly discredited the medical opinions of Dr. Fred A Lux, Dr. Michael Donndelinger, and Dr. Jessica Maryniuk, whom Plaintiff contends found him unable to work.  (*See* ECF No. 19 at 1.)  As previously noted, however, the record does not reflect that any of these doctors found him unable to work during the period under review.  Moreover, even if these doctors had opined that Plaintiff was unable to work, whether a claimant is disabled or able to work is an issue expressly reserved to the Commissioner.  20 C.F.R. § 404.1520b(c)(3)(i).  The Court therefore finds that the ALJ did not err by failing to consider any of the contested medical opinions in the manner Plaintiff suggests.  Moreover, the ALJ states that he considered the entire record, including the medical opinion evidence.  (R. 17-21.)  Having considered the entire record, the ALJ was not required to adopt or defer to any particular doctor's opinions.

To the extent Plaintiff argues the ALJ failed to consider his Chronic Fatigue Syndrome (ECF No. 1 ¶ 5) or Chronic Pain Syndrome (ECF No. 19 at 1), the record clearly reflects the ALJ considered Dr. Peter Kent's medical report (R. 18) and acknowledged the severity of Plaintiff's chronic head pain and fatigue despite limited medical evidence supporting it (R. 18-19).  The ALJ explained that he adjusted Plaintiff's RFC accordingly, by limiting Plaintiff to light exertional work and including environmental restrictions related to noise and pulmonary irritants.  (R. 18-19.)

The ALJ also acknowledged Plaintiff's testimony that his daily activities were very limited, but the ALJ observed: (1) the record did not contain objective evidence to support Plaintiff's claims; and (2) even if Plaintiff's daily activities were as limited as Plaintiff described, it was difficult to attribute that degree of limitation to Plaintiff's medical condition in view of relatively weak medical evidence.  (R. 21.)  The ALJ also pointed out that Plaintiff regularly engaged in a broad range of activities that were fully consistent with, and likely in excess of, the restrictions he

19

included in Plaintiff's RFC (R. 21 (explaining that Plaintiff lived alone in a townhome; independently attended to his personal care needs; went out in public alone; drove a car; shopped with a computer; did some housework; prepared some meals; watched movies with others; maintained familial relations and at least one friendship; frequented a drop-in center; read; followed television programs; and managed his personal finances).)

Finally, the ALJ also observed that Plaintiff's work history was sporadic prior to Plaintiff's alleged onset date of disability. (R. 21.) He pointed out that Plaintiff's earning records showed no work-related income whatsoever in 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2015, 2016, and 2017, and that in 2007 Plaintiff worked below the level of substantial gainful activity. (R. 21 (citing R. 294—296).) The ALJ found Plaintiff's spotty long-term work history undermined his claim that he became medically disabled from all full-time employment in October 2018.

The Court acknowledges Plaintiff's belief that he was unfairly judged for several years when he did not have a proper diagnosis, and that his case fell through the cracks before he could prove he his disabled (ECF Nos. 1 at 2; 19 at 1), but the ALJ's Decision was limited to the period under review. The Court cannot reopen the record and reevaluate Plaintiff's prior claims. Moreover, while Plaintiff may disagree with the ALJ's findings, the Court finds the ALJ properly evaluated the record and supported his conclusion with sufficient evidence that a reasonable mind could accept the Decision. *Biestek*, 139 S.Ct. at 1154.

To the extent Plaintiff believes the ALJ's RFC does not account for the severity of his Chronic Fatigue or Chronic Pain Syndromes, Plaintiff bore the burden to prove additional limitations were necessary. *Baldwin*, 349 F.3d at 556. The mere presence of a condition such as Chronic Fatigue Syndrome or Chronic Pain Syndrome is not the dispositive issue in a disability

evaluation; rather, the ALJ must consider the Plaintiff's actual and specific functional limitations resulting from the condition. *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990) ("[T]he ALJ properly focused on the functional limitations caused by [Plaintiff's condition].").  Moreover, even if there is substantial evidence that would support a more restrictive RFC overall, the issue "is not whether substantial evidence exists to reverse the ALJ," but "whether substantial evidence supports the ALJ's decision." *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision.  *Chesser*, 858 F.3d at 1164; *see also Nash*, 907 F.3d at 1089 ("If substantial evidence supports the Commissioner's conclusions, [the] Court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome.") (quoting *Travis*, 477 F.3d at 1040).

Here, the ALJ properly considered the relevant evidence before him, and the Court finds his determination that no additional limitations were warranted is supported by substantial evidence.  The Court thus affirms the ALJ's determination that Plaintiff was not disabled during the period under review.

## CONCLUSION

For the foregoing reasons, the Court finds that substantial evidence in the record as a whole supports the Commissioner's Decision.  The Court accordingly grants the Commissioner's motion for summary judgment (ECF No. 25), denies Plaintiff's motion for summary judgment (ECF No. 18), and affirms the Commissioner's Decision.

**ORDER**

Based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    The Commissioner's Motion for Summary Judgment (ECF No. [25]) is **GRANTED**;

2.    Plaintiff's Motion for Summary Judgment (ECF No. [18]) is **DENIED**;

3.    The Commissioner's Decision is **AFFIRMED**; and

4.    Plaintiff's Complaint (ECF No. [1]) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINLY.**

Dated: February 13, 2023                              *s/ Dulce J. Foster*
                                                     DULCE J. FOSTER
                                                     United States Magistrate Judge